UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEITH SYKES,

          Plaintiff,

v.

FED EX FREIGHT EAST,

          Defendant.

_____/

Case No. 2:17-cv-13189

HONORABLE STEPHEN J. MURPHY, III

## OPINION AND ORDER
## GRANTING IN PART AND DENYING IN PART
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [18]

On September 6, 2017, Plaintiff Keith Sykes brought an action against his former employer, Defendant Fed Ex Freight East, for violations of Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 *et seq.* ("Elliott-Larsen"). Plaintiff alleged race discrimination, hostile work environment, and retaliation. *See* ECF 26, PgID 948–54.[1] On October 31, 2018, Defendant filed a motion for summary judgment. ECF 18. The Court determined that oral argument is unnecessary. ECF 27. For the reasons below, the Court grants in part and denies in part Defendant's motion for summary judgment.

---

[1] On December 21, 2018, the Court ordered Defendant to provide a copy of state court papers, including the complaint, in accordance with court rules and the applicable statutory law. ECF 24, PgID 877–78.

# BACKGROUND[2]

Plaintiff is an African-American male who was employed by Defendant as a dock worker in Romulus, Michigan. ECF 22-2, PgID 715. He began working for FedEx National in 2010. *Id*. Plaintiff noticed a "culture of racism" in 2012, after FedEx National "merged" with Defendant. *Id*. at 721. Plaintiff's narrative can be broken down into three themes: (1) racial slurs at the workplace, (2) different treatment of black and white employees, and (3) attendance issues leading up to his termination.

As an initial matter, Plaintiff faced racial slurs at work. Beginning in 2012, Defendant's employee, a driver named Dave Braugher, called Plaintiff a racial epithet, the N-word, several times. ECF 22-2, PgID 721, 723–24. Braugher called Plaintiff the epithet "[e]very time he [saw]" him, which was not every day. *Id*. at 721–22. Braugher was white. *Id*. at 721. Plaintiff recalled that three other dock workers—Chris "C Moe," Raymond McGee, and "Russell"—witnessed Braugher calling Plaintiff the epithet. *Id*. at 723. In March 2017, Plaintiff reported the behavior for the first time to LaZonja Smith in Defendant's human resources department. *Id*. Plaintiff testified that he did not make a complaint earlier because he did not "trust management" and did not wish to lose his job. *Id*. at 724. After making the complaint, Plaintiff's shifts were moved to a different time and he no longer encountered Braugher at work. *Id*. at 723, 726. Plaintiff did not hear any assurances from Smith about Braugher and was unsure whether she was responsible for his no longer encountering Braugher. *Id*. at 726.

---

[2] The Court views the evidence in the light most favorable to Plaintiff, the non-moving party. The fact summary does not constitute a finding of fact.

According to Smith, Plaintiff failed to cooperate with her investigation into the usage of the epithet because he did not identify Braugher and suggested that the incidents had occurred years ago. *See* ECF 18-2, PgID 306. She did not know the identity of the individual until Plaintiff filed his complaint. *Id.*[3]

Another one of Defendant's employees, terminal manager Joe Pollock, referred to another black employee, Charles Bailey, as "Flava Flav." ECF 22-2, PgID 724. Plaintiff witnessed Pollock refer to Bailey as "Flava Flav" twice. *Id.* at 724. Plaintiff saw Mike Carter and a supervisor named Doug standing nearby when Pollock made the comments the first time. *Id.* Plaintiff remembered that people were present on the dock during the second incident. *Id.* Plaintiff believed that Pollock and Bailey had a "friendly" relationship. *Id.* at 725.

Plaintiff mentions other alleged incidents of the use of slurs or epithets. Plaintiff did not witness all of these events. For example, Plaintiff alleges that Pollock referred to a black employee as "monkey," but did not see it firsthand. *Id.* And Defendant issued an improvement letter to Plaintiff's supervisor, John McNamee, regarding incidents between McNamee and black employees, including McNamee's comment that another's employee's badge photograph looked "cracked out." ECF 22-7, PgID 827. According to the letter, McNamee denied that the remark was racially motivated. *Id.* McNamee also allegedly insulted the same black employee's "fro" as

---

[3] It is not clear whether Smith is referring to Plaintiff's EEOC complaint or his complaint in the instant case.

"fucked up." *See* ECF 22-5, PgID 816. Plaintiff did not witness the remarks, and McNamee did not make the remarks about Plaintiff.

The second theme in the alleged facts is differential treatment between black and white employees. Plaintiff never observed Pollock sending white employees home early even though he saw Pollock send black employees home early "several times". ECF 22-2, PgID 727. Plaintiff was not sent home early. *Id.*

Plaintiff believes he was "passed up" for promotions. ECF 26, PgID 950. Plaintiff applied for a supervisor position for which he believed he was eligible; he did not receive an interview. ECF 22-2, PgID 729–30. Plaintiff observed that Pollock promoted no black employees but did promote white employees. *Id.* at 729. Plaintiff recalled that Smith said he had submitted the application incorrectly because he did not use the company computer. *Id.* at 730. According to Smith, Plaintiff was also ineligible for supervisor positions because of his attendance issues. ECF 18-2, PgID 306. An email exchange between Smith and Plaintiff reflects her explaining that the attendance issues rendered Plaintiff ineligible for transfer. ECF 25, PgID 917–19. Plaintiff's attendance issues are discussed in more detail below.

At some time before June 12, 2017 and after not receiving an interview for the supervisor position, Plaintiff filed an EEOC complaint. ECF 22-12. Plaintiff testified that after he filed the EEOC complaint, his hours were reduced and he was given "faulty equipment" including the "worst forklift" with "bent forks" and an uncomfortable seat. ECF 22-2, PgID 739. Plaintiff complained about the reduced hours and faulty equipment to his supervisor, Todd, but nothing changed. *Id.*

As a third matter, although Plaintiff had documented attendance issues during his employment with Defendant, he disputes the details of the attendance issues.

Plaintiff noticed that white employees took a Saturday off to watch a hockey game and did not receive attendance points, even though he received points when he took a Saturday off. *Id.* at 727. Plaintiff did not know whether the white employees provided proper notice. *Id.* Deposed white employees stated that they had no unwarranted write-ups. *See* ECF 22, PgID 702.

Plaintiff received attendance points for not working on Saturdays. ECF 22-2, PgID 731. Plaintiff asserts that he previously did not receive attendance points for not working on Saturdays. *Id.* at 732, 758. McNamee reported Plaintiff's absences, even though Plaintiff believed—based on his conversations with McNamee—that the absences were excused. *Id.* at 758. Plaintiff recalled calling McNamee to inform him in advance he was not available on a given Saturday, and McNamee telling him he was "good" and "covered." *Id.* Beginning around February 23, 2017, after conversing with Pollock, Plaintiff was on-call on Saturdays to accommodate his schedule. *See* ECF 22-15, PgID 854. Defendant represents that Plaintiff went back onto a regular schedule in March 2017. ECF 25, PgID 888. But the conversation Defendant cites demonstrated that Plaintiff expressed a desire to go back onto a regular schedule and some reservations about doing so. *Id.* at 900–02. It is unclear whether and when Plaintiff returned to the regular schedule, because, on March 14, 2017, he stated that he was still on-call. *See id.* at 904–05.

Plaintiff's "exception tracking" record from November 30, 2015 to November 30, 2016, reflects five "absences" and two "no call, no show[s]" on (Saturday) September 24, 2016 and (Wednesday) November 30, 2016. ECF 22-3, PgID 761. A "notification form" states that Plaintiff had unexcused absences on (Saturday) October 29, 2016, (Saturday) November 19, 2016, (Wednesday) November 30, 2016, (Tuesday) February 7, 2017, and (Saturday) March 25, 2017, with verbal attendance notification on February 7 and written notification on March 25. ECF 22-16, PgID 856. A "corrective action recap" shows five absences and one no-call, no-show from October 29, 2016 to May 15, 2017, with two "critical written notification[s]" and one "written notification." ECF 22-14, PgID 852. One of the critical written notifications was for (Saturday) March 25, 2017. *Id.*

Plaintiff received his first attendance notification on November 30, 2016. ECF 22-11. Plaintiff received several attendance notifications, including for November 30, 2016, February 7, 2017 and an "unexcused absence" on March 25, 2017, but Plaintiff maintains that at least some of these were excused absences. ECF 22-2, PgID 737–38. Plaintiff was on a "written critical" period for attendance until April 29, 2017, which he completed. *See* ECF 22-17; ECF 22-2, PgID 735. On May 5, 2017, Smith informed Plaintiff that he was not eligible for promotion or transfer for a period of six months due to his attendance issues. ECF 25, PgID 919. On May 8, 2017, Smith congratulated Plaintiff on cleaning up his attendance record. ECF 22-17.

On May 15, 2017, Plaintiff called Defendant's employee, terminal manager Teon Price, to tell him he would not work the next day. ECF 26, PgID 951. On May

17, 2017, Defendant terminated Plaintiff for a "no call/no show" the previous day. ECF 22-2, PgID 740.

## STANDARD OF REVIEW

The Court must grant summary judgment "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To show that a fact is, or is not, genuinely disputed, both parties are required to either "cit[e] to particular parts of materials in the record" or "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

A fact is "material" for purposes of summary judgment if proof of that fact would establish or refute an essential element of the cause of action or defense. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). A dispute over material facts is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When determining whether the movant has met his burden, the court views the evidence in the light most favorable to the nonmoving party. *Smith Wholesale Co., Inc. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 861 (6th Cir. 2007). But the Court may not judge the evidence or make findings of fact. *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435–36 (6th Cir. 1987).

The moving party has the burden of showing that no genuine issue of material fact exists. *Id.* at 1435. Once the moving party carries the initial burden of demonstrating that there are no genuine issues of material fact, the burden shifts to

the nonmoving party to present specific facts to prove that there is a genuine issue for trial. *Anderson*, 477 U.S. at 256.

## DISCUSSION

In its motion for summary judgment, Defendant raises five arguments. First, Defendant raises a new "time-barred" argument. ECF 18, PgID 219.[4] Defendant also argues that Plaintiff fails to establish a prima facie case of race-based harassment, race discrimination, or retaliation, and that Plaintiff fails to prove that Defendant's actions were pretextual. ECF 18, PgID 221, 225, 227, 228.

I.    <u>Contractual Limitations Period</u>

Defendant asserts that a statement in Plaintiff's 2010 employment application bars claims based on "interactions or events" before March 6, 2017. ECF 18, PgID 219–20. The argument is unconvincing because many incidents occurred within the contractual limitations period.

The employment application states, "To the extent the law allows me to bring legal action against the company, I agree to file any charge or complaint or commence any legal action relating to my . . . employment with FedEx National no later than 6 months from the date of the employment action forming the basis of my lawsuit[.]". ECF 22-19, PgID 870. Under Michigan law, terms in an employment application are part of an employee's contract of employment. *Thurman v. DaimlerChrysler, Inc.*, 397

---

[4] Defendant did not raise the new "time-barred" argument in its answer. *See* ECF 5, PgID 24. On December 21, 2018, the Court denied Defendant's motion to amend its answer to include this argument. ECF 24.

F.3d 352, 356 (6th Cir. 2004) (citing *Timko v. Oakwood Custom Coating, Inc.*, 244 Mich. App. 234, 244 (2001)).[5]

But according to the evidence, several events and employment actions underlying Plaintiff's complaint occurred after March 6, 2017, within the contractual limitations period. Defendant terminated Plaintiff in May 2017. And it is not clear exactly when in March Plaintiff reported the N-word incidents to Defendant's human resources department and to the EEOC. Two attendance incidents occurred after March 6, 2017. *See* ECF 22-16, PgID 856; ECF 22-14, PgID 852. The record shows that Smith emailed Plaintiff on May 5, 2017 about his ineligibility for promotion or transfer. ECF 25, PgID 919. And some of Plaintiff's communications with Defendant regarding his attendance and schedule occurred after March 6, 2017. *See* ECF 25, PgID 894–911 (texts between Plaintiff and Smith after March 6, 2017 regarding Plaintiff's schedule and showing Plaintiff disputing his attendance record); *id.* at 917 (email dated May 8, 2017 regarding Plaintiff's attendance record).

The evidence therefore reflects several relevant events within the contractual limitations period. Accordingly, although Plaintiff will need to show that incidents or employment actions occur within the contractual limitations period, the statement in the employment application does not bar Plaintiff's claims as a matter of law.

---

[5] By its terms, the provision does not encompass employment with related entities to FedEx National or its successors or assigns, even though elsewhere, different provisions refer to FedEx National's agents and sister companies. ECF 22-19, PgID 870. In *Thurman*, however, the provision was valid between Thurman and DaimlerChrysler even though the text of the provision referred to Chrysler Corporation. *See* 397 F.3d at 354.

II.   Plaintiff's Hostile Work Environment Claim

Plaintiff alleges that he was subjected to a hostile work environment because Braugher called him the N-word. *See* ECF 26, PgID 953–54; ECF 22, PgID 703–04.

Elliott-Larsen covers hostile work environment claims based on any enumerated classification. *See Malan v. Gen. Dynamics Land Sys., Inc.*, 212 Mich. App. 585, 587 (1995) (collecting cases).

Under Michigan law, to establish a prima facie case of hostile work environment, a plaintiff must show:

> "(1) [he] belonged to a protected group; (2) [he] was subjected to communication or conduct on the basis of [the protected status]; (3) [he] was subjected to unwelcome . . . conduct or communication [involving the protected status]; (4) the unwelcome . . . conduct was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior."

*Quinto v. Cross & Peters Co.*, 451 Mich. 358, 368–69 (1996) (citations omitted). Whether the unwelcome conduct constitutes a hostile work environment is determined by "whether a reasonable person, in the totality of circumstances, would have perceived the conduct at issue as substantially interfering with the plaintiff's employment or having the purpose or effect of creating an intimidating, hostile, or offensive employment environment." *Id.* at 369 (citation omitted).

"If the plaintiff can show that a hostile work environment existed, she must then prove that her employer 'tolerated or condoned the situation' or 'that the employer knew or should have known of the alleged conduct and failed to take prompt

remedial action.'" *Jackson v. Quanex Corp.*, 191 F.3d 647, 659 (6th Cir. 1999) (quoting *Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 349 (6th Cir. 1988)).

"Courts may hold an employer directly, not derivatively, liable for co-worker harassment if 'its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known.'" *See Quanex Corp.*, 191 F.3d at 659 (6th Cir. 1999) (quoting *Blankenship v. Parke Care Ctrs.*, 123 F.3d 868, 873 (6th Cir. 1997)).[6]

Here, Defendant argues that Plaintiff fails to show that he was subjected to "pervasive or severe harassment." ECF 18, PgID 222-23.

Of the comments that Plaintiff observed, only Braugher's use of the N-word epithet to Plaintiff rises to the level of harassment. "[T]he use of the word 'nigger,' even taken in isolation, is not a 'mere offensive utterance.'" *Johnson v. United Parcel Serv., Inc.*, 117 F. App'x 444, 454 (6th Cir. 2004) (collecting cases).

Based on the pleadings, Plaintiff's theory appears to be that Defendant is liable because of its response to Plaintiff's report of Braugher's behavior.[7] But Plaintiff does not submit evidence showing that Defendant manifested indifference or unreasonableness in response to Plaintiff's report. Smith declared that Plaintiff was "uncooperative" with her epithet investigation. ECF 18-2, PgID 306. Smith also

---

[6] Plaintiff has not argued that Defendant is derivatively liable for Braugher's behavior.

[7] *E.g.*, "Plaintiff complained to human resources about being called the aforementioned racial slur but to the best of his knowledge, nothing was ever done to address the complaint." ECF 26, PgID 949 (Plaintiff's complaint); *see also id.* at 952 ("[H]aving his complaints ignored by management; [H]aving complaints not fully investigated and then dismissed[.]").

declared that she did not know who had made the comment to Plaintiff until she saw the complaint. *Id.* Plaintiff does not submit evidence to the contrary.[8]

Plaintiff failed to establish a prima facie case that he was subject to a hostile work environment from Braugher's unwelcome verbal conduct due to his race. In particular, he failed to present evidence that Defendant acted indifferently or unreasonably in response to Plaintiff's report of Braugher's behavior. The Court will therefore grant Defendant's summary judgment motion regarding Plaintiff's hostile work environment claim.

III.   Plaintiff's Race Discrimination Claim

Plaintiff alleges that Defendant discriminated against him on the basis of race by treating him differently from similarly situated employees. He does not specify in his complaint how Defendant allegedly treated him differently. *See* ECF 28, PgID 952–53. Plaintiff argues that there is both direct and circumstantial evidence of discrimination.

Under the Elliott-Larsen Act, an employer must not "hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition or privilege of employment [because of race]." Mich. Comp. Laws § 37.2202(1)(a). A plaintiff may prove that he was subjected to disparate treatment through direct or circumstantial evidence. *Sniecinski v. Blue Cross & Blue Shield of Mich.*, 469 Mich. 124, 132 (2003) (citation omitted).

---

[8] Plaintiff merely testified that after he complained about the usage of the N-Word epithet, he no longer worked with Braugher and he was not sure whether the change was because of his report to Smith. ECF 22-2, PgID 723.

When presenting direct evidence, a plaintiff must prove that unlawful discrimination was a motivating factor of the defendant's action. *Graham v. Ford*, 237 Mich. App. 670, 676–77 (1999). When there are multiple possible explanations for the defendant's action—some legitimate and some impermissible—courts engage in a "mixed motive" analysis. *Harrison v. Olde Fin. Corp.*, 225 Mich. App. 601, 612–13 (1997). "The elements of a mixed motive case are (1) the plaintiff's membership in a protected class, (2) an adverse employment action, (3) the defendant was predisposed to discriminating against members of the plaintiff's protected class, and (4) the defendant actually acted on that predisposition" in taking the adverse employment action. *Wilcoxon v. Minn. Min. & Mfg. Co.*, 235 Mich. App. 347, 360–61 (1999). Examples of adverse employment actions include termination, reduction in work responsibilities, *id.* at 363 (citation omitted), and denial of promotion, *Lulaj v. Wackenhut Corp.*, 512 F.3d 760, 765 (6th Cir. 2008).

When proceeding on direct evidence, the plaintiff must establish evidence of his qualifications and "direct proof that discriminatory animus was causally related to the decisionmaker's action." *Harrison*, 225 Mich. App. at 612–13. If the plaintiff can establish qualifications and causal relation, the case should be submitted to the factfinder. *Id.* at 613; *see also Downey v. Charlevoix Cty. Bd. of Rd. Comm'rs*, 227 Mich. App. 621, 636 (1998) (holding that judgment as a matter of law was inappropriate when there was a question of fact regarding the reason for a plaintiff's discharge). "[I]n a case involving direct evidence of discriminatory action, the employer may also assume the burden of persuading the factfinder that . . . the

employer would have made the same decision without consideration of discriminatory factors." *Harrison v. Olde Fin. Corp.*, 225 Mich. App. at 684. Causal relation can be shown if a decisionmaker fires the plaintiff in part due to a racially motivated report prepared by a non-decisionmaker. *See Clum v. Jackson Nat'l Life Ins.*, Docket No. 307357, 2013 WL 5925989, at *6–10 (Mich. Ct. App. Nov. 5, 2013).

When dealing with Elliot-Larsen discrimination claims based on circumstantial evidence, Michigan courts employ a burden-shifting framework. *E.g.*, *Hazle v. Ford Motor Co.*, 464 Mich. 456, 462–63 (2001) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973)). A discrimination case based on circumstantial evidence requires a plaintiff to show that (1) he was a member of a protected class, (2) he suffered an adverse employment action, (3) he was qualified for the position, and (4) the adverse action occurred under circumstances that gave rise to an inference of unlawful discrimination. *Lulaj*, 512 F.3d at 765 (6th Cir. 2008) (citing *Lytle v. Malady*, 458 Mich. 153 at 172–73 (1998)). If the plaintiff makes the showing, the defendant can rebut the presumption of discrimination by articulating a legitimate nondiscriminatory reason. *Id.* (citation omitted). If the defendant can articulate such a reason, the burden shifts back to the plaintiff to show that the articulated reason was pretextual. *Id.* (citation omitted). To do so, "the plaintiff must demonstrate that the evidence in the case, when construed in the plaintiff's favor, is sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff." *Hazle*, 464 Mich. at 465 (quotations and citation omitted).

Defendant argues that Plaintiff fails to establish a prima facie claim of race discrimination because Plaintiff cannot establish that he was qualified for the job. Defendant points to Plaintiff's failure to maintain "regular and predictable on-site job attendance." ECF 18, PgID 225–26. Defendant also avers that Plaintiff did not establish that Defendant treated him less favorably than non-African-American employees. *Id.* at 226.

### A.  *Direct Evidence*

Plaintiff argues that there is direct evidence of discrimination: Braugher's use of the N-word to him, McNamee's "cracked out" remark about another African-American employee, and Pollock's use of "Flava Flav" and "monkey" to refer to another African-American employee. ECF 22, PgID 699.

The Court conducts a mixed-motive analysis of Plaintiff's direct-evidence-racial-discrimination claims. Impermissible racial discrimination and a legitimate application of Defendant's attendance policy are both possible explanations of Defendant's actions towards Plaintiff.

### 1.  Protected Class.

It is uncontroverted that Plaintiff belongs to a protected class (race) and that the alleged comments were made about African American individuals.

### 2.  Predisposition.

Braugher's use of the N-word does not constitute direct evidence of discrimination. He was not a decision maker regarding Plaintiff's schedule, promotion, or termination. And he did not make any reports that affected those aspects of Plaintiff's employment.

In contrast, McNamee allegedly informed Plaintiff that he was "good" and "covered" regarding certain Saturday absences. ECF 22-2, PgID 758. Some Saturday absences, though, appeared on Plaintiff's attendance record. Plaintiff argues that some of the absences on his record were excused. *Id.* at 731–32, 758. McNamee is therefore a non-decisionmaker who allegedly reported Plaintiff's attendance issues, which contributed to Plaintiff's termination. *See* IV, Causation, *infra.*

It is sufficient to infer that McNamee's "cracked out" remark, when combined with insulting a "fro," suggest a predisposition to discriminate against African Americans. McNamee's "cracked out" remark, for which Defendant issued him an improvement letter, constitutes direct evidence of racial animus. *See, e.g., Graham*, 237 Mich. App. 678–81 (listing examples of statements, including racial terms like "boy," "honkey," and "Uncle Tom," that provided direct evidence of discriminatory predisposition). Direct evidence can be submitted to the factfinder even if the statements demonstrating racial animus are not directed toward the plaintiff or are not about the plaintiff. *See id.* [9]

Pollock's use of "monkey" to describe an African-American individual is also a sufficient to infer a predisposition to discriminate against African Americans. Pollock's use of "monkey"—as alleged—constitutes direct evidence of racial discrimination.

---

[9] *Graham* cited fifteen pieces of testimony as direct evidence. Seven pieces of testimony came from nonplaintiffs. And some of the alleged discriminatory statements were not made about plaintiffs.

3.      Adverse Employment Action.

Termination, reduction in work responsibilities, and denial of promotion are forms of adverse employment action. Plaintiff alleges that Defendant denied him a promotion, reduced his hours, and ultimately terminated him.

4.      Causation.

Plaintiff's testimony and Defendant's records show that McNamee made racially derogatory comments. And Plaintiff alleges that McNamee "selectively reported" his excused absences, which is why his attendance issues accumulated. ECF 22, PgID 684.

"When a decision to fire is made with no unlawful animus on the part of the firing agent, but partly on the basis of a report prompted (unbeknownst to that agent) by discrimination, discrimination might perhaps be called a 'factor' or a 'causal factor' in the decision." *Clum v. Jackson Nat. Life Ins. Co.*, No. 307357, 2013 WL 5925989, at *6 (Mich. Ct. App. Nov. 5, 2013) (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 418–19 (2011)).

McNamee allegedly represented that certain Saturday absences were excused, but the absences appeared on Plaintiff's attendance record. ECF 22-2, PgID 731–32, 758; *see also* ECF 22-16, PgID 856 (attendance record). McNamee therefore allegedly made a report that contributed to Plaintiff's termination. There is a genuine issue of material fact as to whether McNamee's racial animus contributed to Defendant's promotion or termination decisions after March 6, 2017.

And Plaintiff's evidence suggest a causal relationship between Pollock's alleged animus and Plaintiff's termination. The evidence suggests that Pollock was a

decisionmaker regarding promotion, scheduling, and termination. Pollock had the authority to set Plaintiff's schedule. Around February 23, 2017, Plaintiff and Pollock agreed that Plaintiff would be on-call on Saturdays so that he would not receive attendance points for not working on Saturdays. *See* ECF 22-13, PgID 850 ("He then inquired if he could go on call since he couldn't commit to working on Saturday's [sic] and didn't want to run the risk of future attendance issues. I said yes he could."). Smith's text to Plaintiff suggests that he would "work no Saturday's [sic]." *See* ECF 22-15. But on Saturday, March 25, 2017, Plaintiff received an unexcused absence. ECF 22-16, PgID 856. There is a discrepancy between Pollock's representation of on-call status and the no-call, no-shows on Plaintiff's attendance record. The evidence, when taken in the light most favorable to Plaintiff, suggests that Pollock misrepresented or misapplied the on-call policy as to Plaintiff and that the misrepresentation or misapplication led to Plaintiff's termination.

Plaintiff does not establish that he was qualified for the promotions and transfers for which he applied. Although Plaintiff alleges that he was given attendance points that he did not incur, the evidence shows that Plaintiff had several attendance points and that Smith explained that Plaintiff was not eligible for promotion or transfer for six months due to his attendance issues. *See* ECF 25, PgID 919. Plaintiff does not show that he should have had zero attendance points or that an employee with multiple attendance points would be qualified to receive a promotion or transfer.

Plaintiff also does not show that he was qualified to avoid a reduction in hours. Pollock's email says that he could not offer Plaintiff a schedule where he could simultaneously avoid Saturdays and 6:00 start times. *See* ECF 22-13. Plaintiff does not show that he was entitled to such a schedule. And Pollock never sent Plaintiff home early. ECF 22-2, PgID 727.

By contrast, the evidence, read in favor of Plaintiff, suggests that but-for his attendance issues, Plaintiff was qualified for his dock worker job. The attendance issues were the cited reason for his termination. Because Plaintiff has shown direct evidence of racial animus of a decision maker (Pollock) or an individual who made reports to decisionmakers (McNamee), Plaintiff can proceed on his claim that race discrimination resulted in his termination.

### B.    *Circumstantial Evidence*

As stated above, Plaintiff does not demonstrate that he was qualified for a promotion or for his preferred schedule. Plaintiff therefore cannot proceed by circumstantial evidence for a race-discrimination claim regarding promotion denials or schedule changes because he fails to establish a prima facie claim.

Defendant offers a legitimate, nondiscriminatory business justification for Plaintiff's termination: his attendance issues. To the extent Plaintiff relies on circumstantial evidence, he shoulders the burden of showing that the attendance justification was merely pretext for discrimination. The attendance reasons have basis in fact: Plaintiff was not present for the dates he received attendance points or no-call, no-shows.

19

Plaintiff represents that Defendant's cited reason was pretextual because Smith told him that he was no longer on probation and would not be terminated for an absence. ECF 22, PgID 702–03. But Smith's email to Plaintiff— congratulating him for cleaning up his attendance issue—actually reads, "If you are off . . . probation . . . ." ECF 22-17, PgID 858. The email does not show her confirming he was off probation. Without more, and not taking into consideration Plaintiff's direct evidence, Plaintiff does not carry his burden of showing pretext. He cannot proceed on circumstantial evidence.

The Court grants in part and denies in part summary judgment on Plaintiff's race discrimination claim.

IV.  <u>Plaintiff's Retaliation Claim</u>

Plaintiff alleges that Defendant retaliated against him for filing complaints about Defendant's practices. ECF 26, PgID 954. In his response to Defendant's summary judgment motion, he argues that Defendant's retaliation took the form of reducing his hours and terminating him. ECF 22, PgID 704.

Under Elliott-Larsen, one or more persons shall not "[r]etaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act." Mich. Comp. Laws § 37.2701(a). To establish a prima facie case of retaliation, a plaintiff must show "(1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that

there was a causal connection between the protected activity and the adverse employment action." *Garg v. Macomb Cty. Cmty. Mental Health Servs.*, 472 Mich. 263, 273 (2005) (citation omitted).

Defendant argues that it reduced Plaintiff's hours to accommodate his request not to work on Saturdays. ECF 18, PgID 227. Defendant also takes issue with the paucity of Plaintiff's evidence to support his allegation that Defendant provided him with inferior equipment. *Id.*

Here, there is no evidence that the individuals responsible for hiring decisions or for providing equipment knew that Plaintiff filed an EEOC complaint or reported race-related behavior to Smith. To the contrary, the evidence reflects that Smith told Plaintiff that she does not participate in promotion decisions relevant to him. ECF 25, PgID 917. And her texts to Plaintiff suggest that she did not inform management about his complaints. *See id.* at 908. Plaintiff has therefore failed to show causation between his filing an EEOC complaint and his termination or reduction of hours. The Court will grant summary judgment in favor of Defendant on Plaintiff's retaliation claim.

## ORDER

**WHEREFORE**, it is hereby **ORDERED** that Defendant's motion for summary judgment [18] is **GRANTED IN PART AND DENIED IN PART**. Plaintiff may proceed on his race discrimination claim regarding his termination, in accordance with this Opinion. The Court grants summary judgment to Defendant on Plaintiff's hostile work environment and retaliation claims.

**IT IS FURTHER ORDERED** that the final pretrial conference is **RESET** for **October 9, 2019, at 10:00 a.m.** The jury trial is **RESET** for **November 5, 2019 at 9:00 a.m.**

This is not a final order and does not close the case.

**SO ORDERED.**

s/ Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: August 3, 2019

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 3, 2019, by electronic and/or ordinary mail.

s/ David P. Parker
Case Manager